UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

THE LEGACY AGENCY, INC.,

                    Petitioner,          20-cv-5771 (JGK)

         - against -                     OPINION AND ORDER

BRODIE SCOFFIELD, MEGHAN WHELAN,
and CHRIS AMEZQUITA,

                    Respondents.
————————————————————————————————

JOHN G. KOELTL, District Judge:

    This action relates to two decisions by an arbitrator
appointed by the Major League Baseball Players Association
("MLBPA") that were rendered to settle an employment dispute
between The Legacy Agency, Inc. ("Legacy") and three of its
former employees, Brodie Scoffield, Meghan Whelan, and Chris
Amezquita. After Legacy filed a petition in the New York State
Supreme Court to confirm the arbitrator's award dated May 6,
2020 ("Award") and subsequent clarification decision dated
June 15, 2020 ("Clarification Decision"), the respondents
removed the action to this Court and Scoffield filed a
cross-petition to vacate the Award. The respondents filed an
amended notice of removal on July 27, 2021, after the Court
directed the parties to file supplemental submissions
regarding the Court's subject matter jurisdiction.

The MLBPA filed an amicus brief in support of confirming the Award. Whelan and Amezquita do not oppose the Award's confirmation. For the reasons that follow, Scoffield's motion to vacate the Award is **DENIED** and Legacy's motion to confirm the Award is **GRANTED**.

I.

The following facts are taken from the Petition, Cross-Petition, and the supporting exhibits and declarations filed by the parties and are undisputed unless otherwise noted.[1]

During the relevant time period, Legacy was a company that employed agents who represented major and minor league baseball players in contract negotiations. The MLBPA is a labor union that is recognized by Major League Baseball ("MLB") and the multi-employer bargaining entity representing MLB clubs ("Clubs") as the exclusive bargaining representative for all MLB players, pursuant to Section 9 of the National Labor Relations Act, 29 U.S.C. § 159. The MLB and MLBPA have entered into a collective bargaining agreement ("CBA") that establishes certain minimum contract terms and requirements for all MLB players. Cross-Pet. ¶¶ 1-4. The CBA also

---

[1] Scoffield represented that he does not challenge any of the Arbitrator's factual findings, Cross-Pet. ¶ 29, and Whelan and Amezquita do not oppose confirmation of the Award, id. at n.2. Accordingly, some facts have been taken from the findings of fact in the Award.

authorizes individual MLB players to designate an agent ("Player Agent") to assist or conduct the negotiation of an individual salary and any special covenants on the player's behalf. Id.

The disputes at issue in the Award and Clarification Decision arose when Scoffield became dissatisfied with his compensation at Legacy, resigned, and established a competitor company that quickly lured away several former Legacy clients. The disputes also involved Whelan and Amezquita, two other former employees of Legacy. Whelan assisted Scoffield with his work at Legacy and left to join Scoffield's new firm shortly after Scoffield resigned. Pet. ¶¶ 7, 9, 11; Award at 13-14. Amezquita, who also worked closely with Scoffield at Legacy, was terminated by Legacy following Scoffield's resignation. Amezquita subsequently joined Scoffield's new firm. Pet. ¶ 21; Award at 14-18.

To be authorized to represent individual players, Player Agents must be certified by the MLBPA and abide by the MLBPA Regulations Governing Player Agents ("Agent Regulations," ECF No. 6-2), which the MLBPA promulgated pursuant to its authority under the CBA. Cross-Pet. ¶ 7. The Agent Regulations include criteria for achieving and maintaining Player Agent certification, periodic reporting requirements for Player

3

Agents, and rules governing the relationships Player Agents may have with their clients, non-client players, Clubs, and other Player Agents.

Scoffield, a certified Player Agent, was employed by Legacy from 2011 until his resignation on September 7, 2018. Pet. ¶ 7. As a Player Agent at Legacy, Scoffield specialized in recruiting young players, who may generate significant future fees but generally do not generate fees during the initial years of their careers. Id. ¶ 8 & n.3; Award at 8.

Scoffield's employment with Legacy was governed by an employment agreement ("Employment Agreement," ECF No. 1-6) and a non-disclosure and non-solicitation agreement ("NDA," ECF No. 1-7), both dated October 11, 2013. The Employment Agreement, which was amended in 2016 when Scoffield was promoted, provided that Scoffield "shall not terminate this Agreement at any time during the Term except by reason of Disability or for Good Reason," and that any termination without "Disability" or "Good Reason" would constitute a breach of the Employment Agreement by Scoffield. Employment Agreement § 4(e); Pet. ¶ 8. Under the Employment Agreement, "Good Reason" was defined as "a material breach of this Agreement by the Company that remains uncured following thirty

(30) days written notice" from Scoffield to Legacy. Employment Agreement § 4(d).

The NDA included certain confidentiality requirements and restrictive covenants prohibiting Scoffield from soliciting players represented by Legacy or other Legacy employees to leave Legacy. NDA § 4. The NDA also contained a "Fee Tail" provision requiring that, if Scoffield resigned and breached the NDA by representing players who were Legacy clients during the year prior to Scoffield's termination date, then in addition to any other remedies, Scoffield would be obligated to pay Legacy a decreasing percentage of fees earned from those former Legacy clients for 5 years following his resignation from Legacy.[2] NDA § 8(d).

In addition to the restrictive covenants of the NDA, as a certified Player Agent, Scoffield was subject to Section 4(L)(1) of the Agent Regulations, which provides that Player Agents owe a fiduciary "Duty of Loyalty" to their employers. The Duty of Loyalty explicitly prohibits Player Agents from "[c]ompeting with the employer while employed by the employer," including "[r]ecruiting for [the Player Agent's]

---

[2] The Fee Tail provision in the NDA requires the payment of 90 percent of all fees due from such former Legacy clients for the year immediately preceding the termination date, then 80 percent of fees for the following year, 50 percent for the next year, and 25 percent of all fees for the fourth and fifth years following the termination. NDA § 8(d).

own present or future self-interest or for any . . . other competitor of the employer" or "using work time or the employer's facilities or equipment to prepare to become a competitor of the employer." Agent Regulations § 4(L)(1)(a).[3] Under the Agent Regulations, post-employment restrictive covenants, such as the Fee Tail provision, are enforceable "only if" certain conditions are met, including that the covenant must be in a "written agreement" and that "[t]he party seeking enforcement of the Restrictive Covenant has not breached the underlying agreement governing the relationship between the parties, nor acted in bad faith." Agent Regulations § 4(L)(2). The Agent Regulations also stipulate that Player Agents consent to the MLBPA's exclusive jurisdiction to resolve all disputes between or among Player Agents and their agencies and affiliated persons or entities relating to the breach of the Duty of Loyalty (including enforcement of restrictive covenants) through arbitration. Agent Regulations §§ 4(L)(1), 4(L)(3), 7(A).

The Employment Agreement contains a "Governing Law" clause that provides:

> This Agreement shall be governed by, construed in accordance with and enforced under the laws of the State of New York without giving effect to any

---
[3] Unless otherwise noted, this Opinion and Order omits all alterations, omissions, emphasis, internal quotation marks, and citations in quoted text.

choice or conflict of law provision or rule that
would cause the application of any jurisdiction
other than New York. . . . Notwithstanding the
foregoing, all disputes between or among the Company
and Employee involving the validity, interpretation,
application, enforcement or alleged breach of the
[NDA] shall be resolved exclusively in accordance
with the final and binding arbitration procedures
set forth in Section 7(A) of the MLBPA [Agent
Regulations].

Id. § 9(d). The NDA similarly provides that any "alleged

breach of any of the restrictive covenants and clauses

relating to the duty of loyalty . . . shall be resolved

exclusively in accordance" with the arbitration procedures set

forth in Section 7(A) of the Agent Regulations, but all other

disputes "[s]hall be governed by, interpreted and enforced in

accordance" with New York law. NDA §§ 9(a)-(b). Under Section

7(A) of the Agent Regulations, the MLBPA has the authority to

select arbitrators to adjudicate disputes, and the arbitrators

have broad authority to, among other things, rule on their own

jurisdiction and issue decisions and awards "including any

appropriate remedy or remedies."

The dispute between Scoffield and Legacy began when

Scoffield raised concerns to Legacy about his compensation.

See Cross-Pet. ¶ 30. Scoffield believed that the amount he

received from Legacy was inconsistent with certain

compensation provisions of the Employment Agreement. Id. In

January 2018, Scoffield sought to discuss the payment of his 2017 commission and bonus compensation, due to be paid by April 30, 2018, and inquired about certain stock options to which he believed he was entitled under the Employment Agreement. Award at 10. After Legacy did not make the commission and bonus payments by April 30, 2018 and no substantive agreement had been reached on Scoffield's stock options, Greg Genske, Legacy's President of Baseball, sent Scoffield a proposal to pay him a certain amount in bonus compensation but did not provide further information about Scoffield's ability to collect on his stock options. Award at 11. Scoffield told Genske that the amount proposed was not enough. Id. On June 12, 2018, Scoffield emailed Genske to state that Scoffield believed that Legacy had breached the Employment Agreement and demanded that the breach be cured immediately. Id.; Cross-Pet. ¶ 30. On July 6, 2018, Legacy paid Scoffield a certain amount and provided Scoffield with an explanation for how Legacy calculated the amount that it believed Scoffield was owed and why Legacy believed that Scoffield's requested amount was incorrect. Award at 11; Cross-Pet. ¶ 30. On August 14, 2018, Scoffield's lawyer responded to Legacy with a letter raising objections to Legacy's calculations. Award at 11-12. On August 23, 2018,

while still employed at Legacy, Scoffield registered a new company, Tidal Sports Group, LLC ("Tidal"). Award at 12. On September 6, 2018, counsel for Legacy responded to Scoffield's email with further explanations regarding Scoffield's compensation and offered to meet with Scoffield to attempt to resolve the disagreements. Id.

The next day, September 7, 2018, Scoffield terminated his employment with Legacy. Id. Scoffield, who had previously told Whelan about his plans to establish Tidal, informed Whelan that he had quit and advised her to seek legal counsel. Award at 13. On that same day, Legacy took steps to terminate Whelan's employment; however, Whelan was not informed that she was fired by Legacy until September 12, 2018. Award at 14. Around this same time, Whelan was found to have downloaded certain confidential Legacy client information onto her personal laptop, including 95 marketing agreements for players that were potential clients of Tidal, and initially refused to return the laptop that Legacy had provided her after she ceased working for Legacy. Award at 52-53; Pet. ¶ 11. Shortly thereafter, Tidal began to represent several former Legacy clients. Pet. ¶¶ 10, 12; Cross-Pet. ¶ 30.

Legacy initially took steps to fire Amezquita on September 7, 2018—the same day Scoffield quit—but then walked

back the termination, claiming that it had been a mistake. Award at 54-55. Amezquita had a "Limited Certification" as a Player Agent, which allowed him to engage in certain recruiting and client maintenance matters, but not in actual contract negotiations with Clubs on behalf of players. Id. at 54. After Scoffield left, Amezquita's duties and responsibilities at Legacy diminished considerably. On October 5, 2018, Legacy's Chief Financial Officer sent Amezquita an email stating that Amezquita had failed to carry out his job duties since August 2018 and had engaged in "willful refusal" to perform his job or "gross neglect" of his duties. Award at 17. Amezquita was then fired on October 10, 2018 and hired shortly thereafter by Tidal. Id. at 18.

After his resignation, Scoffield refused to pay any Fee Tails to Legacy. Pet. ¶¶ 12-13. Legacy then filed a grievance against Scoffield and Whelan with the MLBPA on October 12, 2018. Id. In the grievance, Legacy claimed that Scoffield had breached his Employment Agreement when he terminated the contract without "Good Reason" (or disability), breached the NDA by soliciting former Legacy clients and refusing to pay the Fee Tails, breached the "Duty of Loyalty" required of Player Agents under Section 4(L)(1) of the Agent Regulations, and made defamatory statements about Legacy. Award at 2.

Legacy sought liquidated damages under the Employment
Agreement, Fee Tails under the NDA, as well as additional
damages, attorney's fees and costs, and injunctive relief. Id.
Legacy further alleged, among other things, that Whelan had
breached her employment agreement with Legacy and defamed
Legacy to Legacy's former clients. Id. at 3. From Whelan,
Legacy similarly sought damages, as well as injunctive relief
and attorneys' fees and costs. Id. Amezquita filed a grievance
against Legacy for wrongful termination, seeking compensation
under his employment agreement, as well as a declaration
excusing him from any post-employment obligations, including
non-compete requirements. Id. at 3-4.

The MLBPA assigned Arbitrator Sylvia P. Skratek
("Arbitrator"), a permanent arbitration panel member for the
MLBPA with over 30 years of experience in dispute resolution
and who worked as a salary arbitrator for the MLB from 2008 to
2019. Pet. ¶ 15. The Arbitrator held a four-day hearing, heard
testimony from eight witnesses, admitted 453 exhibits, and
accepted 380 pages of post-hearing briefing. Pet. ¶ 16; id. at
n.8. Scoffield argued that Legacy's failure to pay his
compensation constituted a breach of his Employment Agreement,
meaning that his resignation was for "Good Reason" and thus
the Fee Tail provision should not apply. Award at 4. Scoffield

also argued that because Legacy breached his Employment
Agreement, the Fee Tail provision was unenforceable under
Section 4(L)(2)(d) of the Employment Regulations. Id. In the
alternative, Scoffield argued that the "Fee Tail is
unreasonable on its face" and should be "subject to
modification by the Arbitrator to be consistent with what is
accepted in the industry." Id.

On May 6, 2020, the Arbitrator issued the Award, finding
that Scoffield had breached his Employment Agreement when he
resigned from Legacy. Award at 42-43. The Arbitrator also
found that Scoffield had solicited certain former Legacy
clients and recruited Whelan, both in violation of the NDA.
Id. at 43-45. The Arbitrator concluded that Legacy had not
committed a "material breach" of Scoffield's Employment
Agreement, and thus Scoffield did not have "Good Reason" to
resign. Id. at 43. Although the Arbitrator found that
Scoffield was entitled to additional compensation from Legacy
in the amount of $41,750.87, the Arbitrator concluded that
Legacy had "acted in good faith" and attempted to comply with
its obligations to Scoffield. Id. at 39-43, 58. The Arbitrator
explained that Scoffield resigned before meeting with Legacy
after having "made no attempt to reconcile his calculations"
for his bonus with Legacy's and "without ever expressly

stating that he wanted to exercise his vested options." Id. at 39-40.

The Arbitrator noted that neither Legacy nor Scoffield agreed with the other party's calculations for the "Net Client Fees," but that "the documents cited indicate that the parties were engaged in a good faith effort to determine the amount of Scoffield's 2017 compensation" and that "the disagreements do not automatically represent a material breach of the agreement." Award at 31.

Next, based on detailed factual findings regarding Scoffield's actions, the Arbitrator determined that Scoffield violated his obligations under Section 4(b) of the NDA by "soliciting, inducing, recruiting, or encouraging" Whelan to leave Legacy and join Tidal and by recruiting two former Legacy clients to sign with Tidal. Award at 44-46. Further, the Arbitrator determined that such actions constituted a breach of the "Duty of Loyalty" that Scoffield owed to Legacy under Section 2(g) of the Employment Agreement and Section 4(L)(1) of the Agent Regulations. Id. at 43, 46-47, 57. Therefore, the Arbitrator determined that Legacy was entitled to damages from Scoffield, in recognition that Scoffield "in effect establish[ed] Tidal based on the relationships and good will that he had developed at the expense of Legacy." Id. at

47. The Arbitrator noted that under Section 4(L)(2)(e) of the Agent Regulations, restrictive covenants must be "reasonably necessary, under the particular facts and circumstances, to fairly compensate the party seeking enforcement of that provision." Id. at 50. However, because Scoffield's Fee Tail provision was considerably higher than the provisions applicable to two comparable Legacy employees, and Legacy had failed to demonstrate that a higher level of fee sharing was necessary, the Arbitrator concluded that the "enforcement of the Fee Tails as written would unjustly enrich [Legacy]." Id. Citing two decisions from courts applying New York law and a treatise, the Arbitrator noted that she could "blue pencil" the Fee Tail provision to reduce the percentage of fee sharing to a level that was "reasonable and enforceable." Id. at 50–51 (citing BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 394–95 (1999); Unisource Worldwide, Inc. v. Valenti, 196 F. Supp. 2d 269, 277 (E.D.N.Y. 2002)). The Arbitrator ultimately reduced the Fee Tails in Scoffield's NDA to match the level of those that were applicable to the two comparable Legacy employees and deemed such damages appropriate. Award at 50–51, 57.

The Arbitrator also concluded that Whelan breached her duty of loyalty to Legacy and ordered her to purchase a laptop charger and return the Legacy laptop, provide Legacy with

certain information, and produce all marketing materials that Whelan downloaded from the Legacy Dropbox that remained in her possession. Award at 51-53, 59. Regarding Amezquita, the Arbitrator determined that although Legacy wrongfully terminated Amezquita without cause, because he was almost immediately rehired by Tidal, Amezquita had not suffered "any actual, quantifiable damages." Id. at 60-61. The Arbitrator concluded that Amezquita was released from any restrictive covenants in his employment agreements with Legacy but was not entitled to any award of damages. Id. at 62.

On May 20, 2020, Scoffield sought a "clarification" of the Award, suggesting that the Fee Tail provision should only require fee sharing for the two clients whose solicitation the Arbitrator found was a violation of the NDA, rather than each of Scoffield's former Legacy clients who later joined Tidal. Pet. ¶ 22; see ECF No. 1-4. In the Clarification Decision, the Arbitrator rejected Scoffield's arguments and emphasized that the Fee Tails "apply to any and all clients of [Legacy] that Scoffield had represented in the one year prior to his termination" and that to find otherwise would "open the flood gate" to further defections. Clarification Decision at 2; Pet. ¶ 25. The Arbitrator further ordered Scoffield to "pay the Fee Tails for all former [Legacy] clients" in accordance with the

Award and Clarification Decision within 10 days. Clarification Decision at 6; Pet. ¶ 26. Through his counsel, Scoffield represented that the Fee Tail amount for 2019 is $816,500. Pet. ¶ 27.

In the Award, the Arbitrator denied the parties' claims for attorney's fees. Award at 63. Further, in the Clarification Decision, the Arbitrator ordered that for both the compensation that Legacy was required to pay Scoffield and Scoffield's required payments under the Fee Tail provision, any failure to make the required payments within the time stipulated "shall result in interest being applied to the unpaid amounts consistent with the rate used to calculate interest on back pay and other monetary remedies by the National Labor Relations Board which is based on the 'short-term Federal rate'." Clarification Decision at 6.

Legacy filed a petition in the New York State Supreme Court seeking confirmation of the Award, including a money judgment for the Fee Tails due for 2019, totaling at least $816,500; pre-judgment interest from June 29, 2020, as calculated by the National Labor Relations Board for backpay; post-judgment interest at the New York statutory rate of nine percent; and attorney's fees and costs associated in connection with confirmation of the Award. Pet. ¶¶ 6, 28-35.

The respondents timely removed the action to this Court and Scoffield filed a cross-petition to vacate the Award.

II.

A threshold question is whether this Court has subject matter jurisdiction over this action.

In the Notice of Removal, the respondents contended that this case presents a federal question under 28 U.S.C. §§ 1331, 1337, and 29 U.S.C. § 185. Notice of Removal ¶¶ 29-32. The respondents also alleged that the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367(a) based on complete diversity of citizenship and supplemental jurisdiction. Notice of Removal ¶¶ 24-28.

On July 9, 2021, after oral argument, the Court directed the parties to file supplemental submissions addressing subject matter jurisdiction. ECF No. 43. On July 27, 2021, the respondents filed an Amended Notice of Removal in which they again alleged that federal jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1332, 1337, and 29 U.S.C. § 185. Amended Notice of Removal ¶¶ 24-32.

However, the respondents amended their allegations with respect to diversity of citizenship jurisdiction. The respondents originally alleged that jurisdiction over Whelan was proper pursuant to supplemental jurisdiction and that the

amount in controversy relating to Whelan did not exceed
$75,000. The Amended Notice of Removal alleged that there was
complete diversity of citizenship and that the jurisdictional
amount in controversy of $75,000 was satisfied for Whelan as
well as for Scoffield and Amezquita. Amended Notice of Removal
¶ 27. There is no opposition to the filing of the Amended
Notice of Removal and all parties agree that jurisdiction is
proper based on complete diversity of citizenship. The Court
therefore accepts the Amended Notice of Removal. See 28 U.S.C.
§ 1653 ("Defective allegations of jurisdiction may be amended,
upon terms, in the trial or appellate courts."); Durant,
Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont, 565
F.3d 56, 65 (2d Cir. 2009) ("[W]e will generally afford an
opportunity for amendment of the pleadings to cure defective
jurisdictional allegations unless the record clearly indicates
that the complaint could not be saved by any truthful
amendment").

   A complaint alleging complete diversity will only be
dismissed if it appears to a legal certainty that the amount
in controversy does not exceed $75,000. See Tongkook Am., Inc.
v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir. 1994).
"When liability among defendants is several, a plaintiff
cannot aggregate its claims against individual defendants in

order to satisfy the jurisdictional amount in controversy requirement . . . It must satisfy the jurisdictional amount with respect to each defendant." Chase Manhattan Bank, N.A. v. Aldridge, 906 F. Supp. 870, 874 (S.D.N.Y. 1995).

The Court of Appeals for the Second Circuit has not explicitly addressed the proper approach for determining the amount in controversy in proceedings to confirm or vacate arbitration awards. See Nakakuki v. Bello, No. 19-cv-6160, 2020 WL 1529441, at *2 (S.D.N.Y. Mar. 31, 2020); Erdheim v. Harris, No. 10-cv-8601, 2019 WL 3219385, at *2 (S.D.N.Y. July 17, 2019). Courts in this Circuit have applied two approaches: the "demand" approach and "award" approach. Erdheim, 2019 WL 3219385, at *2 (collecting cases). "The 'demand' approach construes the amount a party demanded in the underlying arbitration as the amount in controversy. The 'award' approach instead construes the amount awarded as the amount in controversy." Id.

There is complete diversity of citizenship in this action. Legacy is a Delaware corporation with its principal place of business in New York, and hence is a citizen of Delaware and New York. Amended Notice of Removal ¶ 24; see 28 U.S.C. § 1332(c)(1) (corporation is a citizen of the state in which it is incorporated and in which it has its principal

place of business). Scoffield and Whelan are citizens of
California, and Amezquita is a citizen of South Carolina.
Amended Notice of Removal ¶ 25.

Moreover, the amount of controversy between Legacy and
each respondent exceeds $75,000. In the arbitration, Legacy
sought and was awarded the Fee Tails from Scoffield, which the
parties agree are worth at least $816,500. Amended Notice of
Removal ¶ 27. This satisfies the amount in controversy
requirement under both the "demand" and "award" approaches.
Likewise, the parties do not dispute that Legacy sought money
damages and equitable relief in excess of $75,000 from Whelan
in the arbitration. Id. The Arbitrator ordered that Whelan
provide an accounting of all fees collected by Tidal from
former Legacy clients on marketing agreements entered before
September 7, 2018, which ultimately resulted in a payment to
Legacy of $82,620. Amended Notice of Removal ¶ 27 & n.1.
Therefore, the amount of controversy between Legacy and Whelan
exceeds $75,000 under either the "demand" or "award"
approach.[4]

As to Amezquita, in the arbitration, Amezquita sought
$98,958 from Legacy based on claims that Legacy wrongfully

---

[4] That the payment of $82,620 was already remitted to Legacy does not divest
the Court of subject matter jurisdiction. See, e.g., Nat'l Cas. Co. v.
Resolute Reinsurance Co., No. 15-cv-9440, 2016 WL 1178779, at *3 (S.D.N.Y.
Mar. 24, 2016).

terminated him and breached his employment agreement. Amended Notice of Removal ¶ 27. The Arbitrator concluded that Legacy had breached the employment agreement but that Amezquita was not entitled to any monetary damages, in part because the liquidated damages clause under which Amezquita was seeking damages was unenforceable. Award at 60-61. Consequently, the amount in controversy requirement between Legacy and Amezquita is not met under the "award" approach. But this does not preclude the Court's exercise of jurisdiction over the claim between Legacy and Amezquita.

Amezquita's original demand against Legacy in the arbitration was at least $98,958, thereby satisfying the amount in controversy requirement under the "demand" approach. Courts in this district have recognized that the "demand" approach is appropriate when a prevailing defendant seeks to confirm an arbitration award that found the defendant not liable for any damages. See, e.g., Nat'l Cas. Co., 2016 WL 1178779, at *2. Because the amount of controversy requirement is met under this approach, the Court has subject matter jurisdiction over the claim between Legacy and Amezquita.

In sum, because there is complete diversity and the amount in controversy requirement is satisfied between the petitioner and each respondent, the Court has diversity

21

jurisdiction over this action. See 28 U.S.C. § 1332. Because
the Court has diversity jurisdiction, it need not reach the
question of whether federal question jurisdiction exists under
28 U.S.C. §§ 1331, 1337, or 29 U.S.C. § 185. See Signal Mut.
Indem. Ass'n, Ltd v. Rice Mohawk U.S. Constr., No. 95-cv-3721,
1996 WL 337294, at *2 (S.D.N.Y. June 19, 1996).

III.

A.

The parties dispute whether the Award should be confirmed
on the merits. Legacy petitions to confirm the Award and
Scoffield petitions to vacate the Award. For the reasons that
follow, the Award should be confirmed.

B.

Legacy and Scoffield dispute whether their respective
petitions should be reviewed pursuant to the Federal
Arbitration Act ("FAA"); Section 301 of the Labor Management
Relations Act ("LMRA"); or New York C.P.L.R. Article 75
("Article 75").

Legacy argues that the Petition should be confirmed under
Article 75 in view of the "Jurisdiction" clause of the
Employment Agreement and because the NDA provides that "[a]ll
disputes" other than those described in "Subparagraph 9(a)
shall be governed by, interpreted and enforced in accordance

22

with" New York law. NDA § 9(b). Scoffield (and the MLBPA)
argue that the MLBPA Player Agent arbitration regime applies
to the CBA between the MLBPA and Clubs and therefore the Award
should be reviewed pursuant to Section 301, 29 U.S.C. § 185.
The parties appear to be aligned in their belief that the FAA
does not provide the appropriate standard.

Legacy's contention that Article 75 applies, rather than
the FAA, is dubious.[5] Even assuming that the parties agreed to
have New York law apply to the "enforcement" of the
contractual provision at issue, Legacy has not explained how
the application of New York law is inconsistent with review of
an arbitration award under the FAA.

Scoffield argues that the FAA does not apply because the
arbitration did not result from the parties' contracts but was
instead required by the MLBPA. Resp. Reply Br. at 8-9. This
assertion is incorrect. As noted above, both the NDA and the

---

[5] Its reliance on Subparagraph 9(b) of the NDA is unpersuasive, because
Subparagraph 9(b) does not apply to disputes "identified in Subparagraph
9(a)," and Subparagraph 9(a) requires that all disputes "involving the
validity, interpretation, application, enforcement or alleged breach of any
of the restrictive convents and clauses relating to the duty of loyalty . . .
be resolved exclusively in accordance with the final and binding arbitration
procedures set forth in Section 7(A) of the MLBPA's Regulations Governing
Player Agents." NDA § 9(a). Because Legacy's grievance against Scoffield is
based, at least in part, on alleged violations of the restrictive covenants
relating to the duty of loyalty in the NDA (specifically Section 4 and 6), it
would appear that this case involves a dispute "involving issues . . .
identified in Subparagraph 9(a)" of the NDA, and is thus excluded from
Subparagraph 9(b)'s scope. Similarly, the "Governing Law" clause of the
Employment Agreement provides that "[n]otwithstanding" the choice of New York
law, disputes over the NDA are governed by Section 7(A) of the Agent
Regulations. Employment Agreement § 9(d).

Employment Agreement provided that any disputes over the validity or alleged breaches of the NDA's restrictive covenants be conducted in accordance with the arbitration provisions of Section 7(A) of the Agent Regulations. Such clauses are plainly "written provision[s] in . . . a contract . . . involving commerce to settle by arbitration a controversy thereafter arising out of such contract." 9 U.S.C. § 2. The fact that the arbitration clause incorporated Section 7 of the Agent Regulations by reference does not alter the fact that it represents a contractual agreement to arbitrate—and thus would appear to be within the FAA's scope.

Nor is it apparent that Section 301 applies to the present dispute. The MLBPA and Scoffield assert that the Agent Regulations are the product of the CBA and preempt state law governing the Player Agent contracts, including any restrictive covenants. Cross-Pet. ¶ 9; MLBPA Amicus Br. at 7. However, the MLBPA and Scoffield have not explained how this is a suit "for violation of [a] contract[] between an employer and a labor organization" or "between . . . labor organizations" within the meaning of the LMRA, such that Section 301 applies. 29 U.S.C. § 185(a). Scoffield is seeking to vacate an Award in a contractual dispute with his former employer. Cf. Whitehurst v. 1199SEIU United Healthcare

Workers E., 928 F.3d 201, 206 (2d Cir. 2019) (stating that
Section 301 governs claims that are "founded directly on
rights created by" or "substantially dependent on analysis of
a collective bargaining agreement"). Scoffield and the MLBPA
have not demonstrated that the Arbitrator was required to
consult (let alone interpret) any provisions of the CBA
itself, nor has Scoffield presented persuasive authority to
support the application of Section 301 to disputes between
agents of a sports union, to which neither the union nor the
employer is a party.[6]

B.

However, as the parties acknowledge, there is little
practical difference between the standards applied under
Article 75, the FAA, and Section 301 to the question of
whether an arbitration award should be confirmed. The Court
has diversity jurisdiction over this case and, regardless of
which standard applies, the Award should be confirmed.
Judicial review of arbitration awards pursuant to Article 75,
Section 301, and the FAA is deferential, limited, and narrowly
circumscribed. See, e.g., Seneca Nation of Indians v. New

---

[6] Indeed, because neither the MLBPA nor any Club is a party to the dispute,
Scoffield's reliance on cases such as White v. Nat'l Football League, 92 F.
Supp. 2d 918, 923-25 (D. Minn. 2000), and Dickey v. Nat'l Football League,
No. 17-cv-12295, 2018 WL 4623061, at *8-10 (D. Mass. Sept. 26, 2018), aff'd,
No. 19-1097, 2020 WL 6819135 (1st Cir. Feb. 13, 2020), is not persuasive.

York, 988 F.3d 618, 625 (2d Cir. 2021) (FAA); Nat'l Football
League Mgmt. Council v. Nat'l Football League Players Ass'n,
820 F.3d 527, 536 (2d Cir. 2016) (Section 301); Geo-Grp.
Commc'ns, Inc. v. Jaina Sys. Network, Inc., 42 N.Y.S.3d 118,
119 (App. Div. 2016) (Article 75). Although Scoffield
disagrees with the Arbitrator's interpretations of the
contractual provisions and Agent Regulations at issue, as well
as her exercise of remedial powers, those objections do not
rise to the level necessary to warrant vacatur of the Award
under Section 301, the FAA, or Article 75. Because the
Arbitrator's Award and Clarification Decision are within the
authority bestowed upon the Arbitrator and draw their essence
from the Employment Agreement, NDA, and Agent Regulations, the
Award should be confirmed.

A federal court's review of an LMRA arbitration award is
"narrowly circumscribed and highly deferential." A&A Maint.
Enter., Inc. v. Ramnarain, 982 F.3d 864, 868 (2d Cir. 2020).
"[A]s long as the arbitrator is even arguably construing or
applying the contract and acting within the scope of his
authority, that a court is convinced he committed serious
error does not suffice to overturn his decision." United
Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29,
38 (1987). "Because it is the arbitrator's view of the facts

and the meaning of the contract for which the parties bargained, . . . [i]t is the arbitrator's construction of the contract and assessment of the facts that are dispositive, 'however good, bad, or ugly.'" Nat'l Football League Mgmt. Council, 820 F.3d at 536 (quoting Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 573 (2013)). Instead, a court's role is "simply to determine whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement." New York City & Vicinity Dist. Council of United Bhd. of Carpenters & Joiners of Am. v. Ass'n of Wall-Ceiling & Carpentry Indus. of New York, Inc., 826 F.3d 611, 618 (2d Cir. 2016). The Supreme Court has explained that district courts "are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract," or "improvident, even silly" mistakes. Misco, 484 U.S. at 36, 39; see also Nat'l Football League Mgmt. Council, 820 F.3d at 536. As long as the award "draws its essence from the collective bargaining agreement and is not merely the arbitrator's own brand of industrial justice, it must be confirmed." Nat'l Football League Mgmt. Council, 820 F.3d at 537.

Similarly, both Article 75 and the FAA require that a court confirm an award unless the award should be vacated or

modified based on certain limited grounds. 9 U.S.C. § 9

("[T]he court must grant such an order unless the award is

vacated, modified, or corrected as prescribed in sections 10

and 11 of this title."); N.Y. C.P.L.R. § 7510 ("The court

shall confirm an award upon application of a party made within

one year after its delivery to him, unless the award is

vacated or modified upon a ground specified in section

7511."). The FAA permits a district court to vacate an

arbitration award on four grounds:

> (1) where the award was procured by corruption,
> fraud, or undue means;
> (2) where there was evident partiality or corruption
> in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct
> in refusing to postpone the hearing, upon sufficient
> cause shown, or in refusing to hear evidence
> pertinent and material to the controversy; or of any
> other misbehavior by which the rights of any party
> have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or
> so imperfectly executed them that a mutual, final,
> and definite award upon the subject matter submitted
> was not made.

9 U.S.C. § 10(a).[7] Similarly, under N.Y. C.P.L.R. § 7511, the

Court is authorized to vacate an award if the court finds that

the rights of the parties were prejudiced by (1) "corruption,

---

[7] The Court of Appeals for the Second Circuit has held "as judicial gloss on the specific grounds for vacatur of arbitration awards in the FAA, an arbitrator's 'manifest disregard' of the law or of the terms of the arbitration agreement 'remains a valid ground for vacating arbitration awards.'" Seneca Nation, 988 F.3d at 625 (quoting Schwartz v. Merrill Lynch & Co., 665 F.3d 444, 451-52 (2d Cir. 2011)).

fraud or misconduct in procuring the award;" (2) "partiality of the arbitrator;" (3) the arbitrator exceeding their power or "so imperfectly executed it that a final and definitive award upon the subject matter was not made;" or (4) the "failure to follow the procedures of [Article 75]." N.Y. C.P.L.R. § 7511(b). See Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 310 (2d Cir. 2005).

Accordingly, a party seeking to vacate an arbitral award on grounds that the arbitrator exceeded the arbitrator's authority faces a high burden. Oxford Health, 569 U.S. at 569 (holding that when determining whether to vacate an Award under Section 10(4) of the FAA, "an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits"); Weiss v. Sallie Mae, Inc., 939 F.3d 105, 109 (2d Cir. 2019) (noting that, under the FAA, "[v]acatur is only warranted . . . when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice"); D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) ("A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high."); New York City

Transit Auth. v. Transp. Workers Union of Am., Loc. 100, 924
N.E.2d 797, 799 (N.Y. 2010) (stating that, under Article 75,
consideration of whether an arbitrator "exceeded his power"
does not "entail the kind of inapt flirtation with the merits,
or . . . inappropriate use of the judicial scalpel to split
the hairs that mark the perimeters of the contractual
provisions that history, legislation, and experience, not to
mention [New York] case law, dictate that we refrain from").

Scoffield advances two primary arguments as to how he
contends the Arbitrator exceeded her authority. First,
Scoffield argues that the Arbitrator exceeded her authority in
enforcing the Fee Tail provision, which Scoffield argues was
contrary to Section 4(L)(2)(d) of the Agent Regulations.
Section 4(L)(2)(d) provides that a restrictive covenant, such
as the Fee Tail provision, is "enforceable only if" the party
seeking to enforce the covenant "has not breached the
underlying agreement governing the relationship between the
parties, nor acted in bad faith." Scoffield argues that
Legacy's failure to pay him compensation that Scoffield
contends he was entitled to was a "breach" that rendered
invalid the Fee Tail provision under Section 4(L)(2)(d).
Further, Scoffield argues that the Award is defective because
the Arbitrator did not conduct a specific, detailed analysis

of whether the Fee Tail provision was enforceable under Section 4(L)(2)(d).

Legacy counters that the Arbitrator made detailed factual findings, including that (1) Scoffield breached his duty of loyalty under the Employment Agreements, NDA, and Agent Regulations; and (2) some fee-sharing was appropriate given that Tidal was benefiting from Legacy's goodwill and investment in young talent. Award at 43-47. Moreover, the Arbitrator concluded that Legacy did not materially breach its agreements with Scoffield and did not act in bad faith, and that Legacy was "entitled" to some return on its investments, provided the returns were "fair and reasonable." Id.

Scoffield claims that the Arbitrator's finding that the Fee Tail provision was enforceable even though Legacy had potentially breached the Employment Agreement, although not materially, was in excess of the Arbitrator's authority. However, as the MLBPA notes in its brief, where a "breach" voids or renders unenforceable part of a contract, interpreting the word "breach" to require a "material breach" is reasonable and well-supported by other precedent. Courts in this Circuit have often found that a material breach—one going to the root of a contract—is required before voiding a contract or excusing an obligation to perform. See, e.g.,

Frank Felix Assocs., Ltd. v. Austin Drugs, Inc., 111 F.3d 284,
289 (2d Cir. 1997) (noting that under New York law, a "party's
obligation to perform under a contract is only excused where
the other party's breach of the contract is so substantial
that it defeats the object of the parties in making the
contract"); Canfield v. Reynolds, 631 F.2d 169, 178 (2d Cir.
1980) ("Rescission is not appropriate where the failure was
not a breach going to the root of the contract."); Sinco, Inc.
v. Metro-N. Commuter R. Co., 133 F. Supp. 2d 308, 311
(S.D.N.Y. 2001) ("It is well-settled under New York law that
in order to justify termination, a breach must be . . . so
substantial and fundamental as to strongly tend to defeat the
object of the parties in making the contract."). Even if
Scoffield disagrees with the Arbitrator's conclusion, the
Arbitrator's interpretation of the Agent Regulations as
permitting the enforceability of the Fee Tail provision,
unless there has been a "material breach" or a breach that
represents a repudiation of the contract was, at least, a
reasonable one.[8] The Arbitrator's interpretation drew its

---

[8] Moreover, Scoffield's argument that the Arbitrator ignored Section
4(L)(2)(d) is not sufficient to warrant vacatur. The Arbitrator did not write
a detailed analysis of her interpretation of Section 4(L)(2)(d) in the
portion of the Award concerning Legacy's grievances against Scoffield.
However, the Arbitrator analyzed the meaning of Section 4(L)(2)(d) more
thoroughly in the portion of the Award regarding Amezquita's grievances,
interpreting the provision to provide that "[e]mployees who are dismissed
without cause are excused from compliance with restrictive covenants." Award

essence from the parties' agreements and the Agent
Regulations, and the conclusions reached in the Award were not
just the Arbitrator's own "brand of industrial justice."
Seneca Nation, 988 F.3d at 626; see Misco, 484 U.S. at 38;
Oxford Health Plans LLC, 569 U.S. at 569.

Scoffield's objections are essentially disagreements with
the Arbitrator's interpretation of the word "breach" in
Section 4(L)(2)(d) and with the factual findings made by the
Arbitrator regarding Legacy's conduct. Scoffield's
disagreements do not demonstrate that the Arbitrator exceeded
any specific limitation on her authority, nor do they
otherwise provide a sufficient basis for vacating the Award.
Misco, 484 U.S. at 37-38 (under the LMRA, "it is the
arbitrator's view of the facts and of the meaning of the
contract that [the parties] have agreed to accept," and "a
court should not reject an award on the ground that the
arbitrator misread the contract"); Shenendehowa Cent. Sch.
Dist. Bd. of Educ. v. Civ. Serv. Emps. Ass'n, Inc., 984 N.E.2d
923, 924 (2013) (affirming denial of an Article 75 petition to
vacate because the "arbitrator's decision did not exceed a
specific limitation on his power; nor was it irrational");

---

at 62. The Arbitrator was plainly familiar with Section 4(L)(2)(d) and there
was no requirement that the Arbitrator provide a further explanation for her
findings that Scoffield was required to pay the Fee Tails.

Oxford Health Plans LLC, 569 U.S. at 569 (when evaluating a petition to vacate an arbitration award pursuant to the FAA, on the grounds that an arbitrator exceeded the arbitrator's jurisdiction, "the sole question for [a court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong").

Second, Scoffield argues that the Arbitrator's decision to modify the Fee Tail provision exceeded the authority delegated to her. However, this argument finds no support in the Employment Agreement, NDA, or Agent Regulations. Section 7(A)(16) of the Agent Regulations provides that any Arbitrator selected by the MLBPA shall be empowered to issue a written award with "any appropriate remedy or remedies." Section 9(e) of the Employment Agreement and Section 8 of the NDA both provide for similarly broad remedial measures. Thus, none of the potential provisions that define the scope of the Arbitrator's authority would have prevented the Arbitrator from modifying the Fee Tail provision to make it less onerous on Scoffield and more consistent with industry practice. The Arbitrator modified Scoffield's Fee Tail provision to Scoffield's benefit to make it consistent with those of two other comparable Legacy employees. The Arbitrator carefully explained her reasoning for why the revision was appropriate

34

and cited authority supporting the propriety of the revision.
Award at 47–51 (citing BDO Seidman v. Hirshberg, 712 N.E.2d
1220, 1226–27 (N.Y. 1999); Unisource Worldwide, Inc., 196 F.
Supp. 2d at 277 (stating that under New York law, "[i]f a
court finds a limitation to be unreasonable, it can 'blue
pencil' the covenant to restrict the term to a reasonable
geographic limitation, and grant partial enforcement for the
overly broad restrictive covenant.")); cf. Jock v. Sterling
Jewelers Inc., 646 F.3d 113, 122 (2d Cir. 2011) ("We will
uphold an award so long as the arbitrator offers a barely
colorable justification for the outcome reached."); Saint Mary
Home, Inc. v. Serv. Emps. Int'l Union, 116 F.3d 41, 44
(2d Cir. 1997). Further, as Legacy notes, it was Scoffield who
requested that the Arbitrator reform the Fee Tail provision.
Therefore, the Arbitrator's decision, at Scoffield's request,
to modify the Fee Tail provision to reduce the percentage of
cost sharing was not in excess of her authority and is not a
sufficient basis for vacating the Award.

IV.

Legacy request that it be awarded the Fee Tail amount for
2019, pre-judgment interest at the rate specified in the Award
(the "short-term federal rate"), post-judgment interest at the
New York statutory rate, and costs and attorney's fees.

It is in the court's discretion to determine whether to award pre-judgment interest in an action to confirm an arbitration award, and, if so, at what rate. Landmark Ventures, Inc. v. InSightec, Ltd., 63 F. Supp. 3d 343, 359 (S.D.N.Y. 2014), aff'd, 619 F. App'x 37 (2d Cir. 2015). As provided in the Award and Clarification Decision, and given the nature of the present dispute, pre-judgment interest at the rate applicable for back-pay as used by the National Labor Relations Board (the "short-term Federal rate") is fair and equitable. See Bhd. of Locomotive Engineers & Trainmen v. Long Island R.R. Co., 371 F. App'x 198, 199 (2d Cir. 2010). Further, Legacy is entitled to post-judgment interest on the full amount of the judgment at the rate provided under 28 U.S.C. § 1961(a). See Lewis v. Whelan, 99 F.3d 542, 545 (2d Cir. 1996).

Further, Scoffield and Whelan's employment agreements provide that the "prevailing party" in "any arbitration or other action arising out of or related to this Agreement . . . shall be entitled to receive an award of all costs and expenses, including reasonable attorney['s] fees and costs." Pet. ¶ 34. As discussed above, Legacy prevailed in the arbitration against Scoffield and Whelan. Legacy is therefore

entitled to costs and attorney's fees in connection with its efforts to enforce the Award against Scoffield and Whelan.[9]

### CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not discussed above, the arguments are either moot or without merit. For the foregoing reasons, Scoffield's petition to vacate the Award is **DENIED** and Legacy's petition to confirm the Award is **GRANTED**.

Legacy is directed to submit a proposed judgment within five days. The respondents may submit any objections two days thereafter. Legacy may submit a motion pursuant to Fed. R. Civ. P. 54(d)(2) after judgment is entered seeking attorney's fees and supporting the amounts sought.

**SO ORDERED.**

Dated:     New York, New York
           September 8, 2021

                                    John G. Koeltl
                               United States District Judge

---

[9] Legacy is not seeking, and the Court is not awarding, attorney's fees incurred by Legacy in the course of the underlying arbitration. See Pet. ¶¶ 34-35; Award at 63 (denying the parties' respective requests for attorney's fees).